**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

LESTER LEE SCARBROUGH, JR.,

                                        Plaintiff,

        v.                                                                  No. 10-CV-1370
                                                                                    (DNH/DRH)

ROBERT CLINTSMAN, Correctional Officer,
Upstate Correctional Facility; MELISSA A.
COOK, Correctional Counselor, Upstate
Correctional Facility; JEFFREY EVANS,
Correctional Psychiatric Social Worker,
Upstate Correctional Facility; DON HAUG,
Correctional Facility Food Service
Administrator, Upstate Correctional Facility;
J. HEALY, Correctional Officer, Upstate
Correctional Facility; RALPH J. ISABELLA,
Correctional Lieutenant, Upstate Correctional
Facility; KING, Correctional Officer, Upstate
Correctional Facility; ERIC E. MARSHALL,
Correctional Officer, Upstate Correctional
Facility; JEFFERY A. MITCHELL, Correctional
Lieutenant, Upstate Correctional Facility;
BRANDON J. NICHOLS, Correctional Officer,
Upstate Correctional Facility; THOMAS QUINN,
Correctional Lieutenant, Upstate Correctional
Facility; DAVID A. ROCK, Superintendent,
Upstate Correctional Facility; and ROBERT C.
WARNOCK, Correctional Sergeant, Upstate
Correctional Facility,
                                        Defendants.
_____

**APPEARANCES:**                    **OF COUNSEL:**

LESTER LEE SCARBROUGH, JR.
08-B-0351
Plaintiff Pro Se
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN          ROGER W. KINSEY, ESQ.
New York State Attorney General     Assistant Attorney General

Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Lester Lee Scarbrough, Jr. ("Scarbrough"), an inmate in the custody of

the New York State Department of Correctional and Community Services ("DOCCS"),

brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, thirteen DOCCS

employees, violated his constitutional rights under the Eighth and Fourteenth Amendments.

Compl. (Dkt. No. 1).  Presently pending are Scarborough's motion to compel discovery

pursuant to Fed. R. Civ. P. 37 and defendants' motion for summary judgment pursuant to

Fed. R. Civ. P. 56.  Docket Nos. 35, 37-39, 42.  For the following reasons, Scarbrough's

motion is denied and it is recommended that defendants' motion be granted.


## I. Background

The facts are related herein in the light most favorable to Scarbrough as the non-

moving party on defendants' motion for summary judgment.  See subsection II(A) infra.

Scarbrough is a former member of the Cripts gang.  Compl. ¶ 20.  Scarbrough was

transferred to Upstate Correctional Facility ("Upstate"), where he was allegedly repeatedly

housed with members from a rival gang, the Bloods, despite defendants being warned by

another inmate that trouble would ensue.  Dkt. No. 39-15 at 28, 33-34.  However, DOCCS

---

[1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

did not include gang designations on inmate forms for cell selection purposes.  Isabella Decl. (Dkt. No. 39-8) ¶ 9; King Decl. (Dkt. No. 39-9) ¶ 9; Quinn Decl. (Dkt. No. 39-13) ¶ 8; Warnock Decl. (Dkt. No. 39-16) ¶ 8.  Instead, inmates are housed together based upon various compatibility assessments.  Isabella Decl. ¶ 9; King Decl. ¶ 9; Quinn Decl. ¶ 8; Warnock Decl. ¶ 8.  Prior to cell assignment, inmate records are checked to make sure that the inmate does not have any known enemies or protective custody orders.  Warnock Decl. ¶¶ 9-11.  Scarbrough contends that his records were not checked, because a check would have revealed that he should have been in protective custody.  Dkt. No. 39-15 at 33-34; Compl. ¶ 28.  Scarbrough "was placed in protective custody . . . due to . . . being forced to defend [him]self against members of the Blood Gang at . . . Auburn OMH Satellite Unit . . . ."  Id. ¶ 42; see also Scarbrough Aff. ¶ 59.  Warnock contends that Scarbrough's record did not indicate that "he was . . . being housed with or near any known enemy and there was no protective custody order," thus, Warnock made the appropriate cell assignment based on that information.  Warnock Decl. ¶¶ 7, 9-11.  Defendants Clintsman, Isabella, Quinn, and King did not have any responsibility for cell placement or review of Scarbrough's records prior to said cell placement.  Clintsman Decl. (Dkt. No. 39-2) ¶ 13; Isabella Decl. ¶ 8; King Decl. ¶ 8; Quinn Decl. ¶ 7.  Those assignments were made by Warnock.  Warnock Decl. ¶ 7.

Scarbrough also contends that various defendants, including Superintendent Rock, Isabella, Quinn, Warnock, and King, informed other inmates about Scarbrough's arrival and prior gang affiliation.  Isabella Decl. ¶ 4; King Decl. ¶ 4; Quinn Decl. ¶ 4; Rock Decl. (Dkt. No. 39-14) ¶ 4; Warnock Decl. ¶ 4; Compl. ¶¶ 18, 20.  Defendants deny these allegations. Isabella Decl. ¶ 5; King Decl. ¶ 5; Quinn Decl. ¶ 5; Warnock Decl. ¶ 5.  Moreover, due to the

safety concerns related to sharing such information, defendants state they would take
immediate action against any staff member relaying such information to other inmates.
Isabella Decl. ¶ 6; King Decl. ¶ 6; Quinn Decl. ¶ 6; Warnock Decl. ¶ 6.


### A.  Altercation on Morning of October 12, 2010

On October 12, 2010, while defendant Corrections Officer Clintsman was serving
breakfast he observed Scarbrough involved in an altercation with his cell mate, Smith.
Clintsman Decl. (Dkt. No. 39-2) ¶¶ 2-3, 4-5.  Scarbrough and Smith were exchanging
closed fist punches.  Clintsman gave Scarbrough and Smith two direct orders to cease
fighting, they initially refused to comply, and then the two separated.  Id. ¶ 6.  Scarbrough
went in to the exercise area, away from Smith.  Id. ¶ 7.  Both inmates were given
misbehavior reports and, as a result of the altercation, Scarbrough was assigned to a
different cell.  Id. ¶¶ 7-8.  Both inmates stated that they had no injuries and refused to tell
investigators why they were fighting.  Id. ¶¶ 9-10.

Clintsman then issued a misbehavior report detailing the above events.  Dkt. No. 39-15
at 2.  The report stated that while Clintsman was delivering breakfast meals, he observed
Scarbrough and Smith striking each other with closed fists and after giving two orders to
cease fighting, the inmates separated and were seen by medical with no further incidents.
Id.  Defendant Mitchell reviewed that report.  Mitchell Decl. (Dkt. No. 39-11) ¶ 13.
Scarbrough contends that Mitchell asked him questions surrounding his medical condition,
and that when Scarbrough reported that he had pain in his back and chest, as well as
breathing difficulty, Mitchell dismissed it.  Compl. ¶ 27.  Mitchell relayed that he was
concerned with "stitches [or] anything bust[ing] open," which did not occur.  Id.; but see

4

Compl. ¶ 49 (identifying the individual who was allegedly providing the insufficient medical care as a civilian RN), Scarbrough Aff. ¶¶ 10-11 (identifying individual who he stated he had back and head pain, though those injuries were pre-existing, as Sgt. Rakoce).

On October 19, 2010, non-party Ranieri presided over a Tier II hearing[2] regarding the disciplinary charge Scarbrough received in conjunction with the altercation. Dkt. No. 39-15 at 16-21. During the hearing, Scarbrough admitted receiving a copy of the formal charges lodged against him. Id. at 17. After Ranieri read the contents of the misbehavior report, Scarbrough pled guilty to participating in violent conduct, creating a disturbance, and fighting. Id. at 18; Clintsman Decl. ¶ 11; but see Scarbrough Aff. (Dkt. No. 42 at 2-15) ¶ 8 (explaining that Ranieri told Scarbrough "to plead guilty and . . . he will give [Scarbrough] a counselor reprimand . . . ."). A fight investigation form was also submitted as part of the hearing evidence, concluding that Smith was the aggressor and Scarbrough attempted to comply with Clintsman's orders but could not due to Smith's actions. Dkt. No. 3-15 at 8. Scarbrough stated that he had no explanation for the events which occurred and was found guilty of all charges based upon his plea, the investigation, and the misbehavior report issued by Clintsman. Id. at 19. Ranieri also emphasized that while it was clear to him that Scarbrough was not the aggressor, fighting at Upstate was unacceptable behavior, which Scarbrough acknowledged. Id. at 19-20. Scarbrough's penalties were a counsel and reprimand. Id. at 16.

---

[2]DOCCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier II hearing, or disciplinary hearing, is required whenever disciplinary penalties not exceeding thirty days may be imposed. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a).

## B. Refusal to Remove Arm from Feed-Up Slot on
## the Afternoon of October 12, 2010

Later on October 12, 2010, in his new cell, Scarbrough was involved in another incident.  Scarbrough's new cell mate, Murray, was also a Bloods gang member. Scarbrough contends that Clintsman escorted him to the cell and was aware of the hostilities between the two inmates, due to their rival gang affiliations, because Murray began fighting with him the moment he entered the cell.  Compl. ¶ 19; Dkt. No. 39-15 at 31-33, 40; Scarbrough Aff. (Dkt. No. 42 at 2-15) ¶¶ 12-17.  Instead of protecting him, Clintsman told them to stop fighting and when they did, Clintsman walked away from the cell.[3]  Compl. ¶ 19; Dkt. No. 39-15 at 31-33, 40; Scarbrough Aff. ¶ 1, 41-43.

Shortly thereafter, Murray began threatening Scarbrough due to the knowledge he gained from defendant King that Scarbrough was a former Crip.  Compl. ¶¶ 43-44. Scarbrough alleges that defendant corrections counselor Cook arrived at the cell to perform a quarterly check of Murray whereupon Scarbrough informed Cook he was in danger, Murray showed Cook the razor which was hidden in his mouth, and Cook informed Murray he was threatening and would receive a misbehavior report as she left the cell.  Id. ¶ 22; Cook Decl. (Dkt. No. 39-3) ¶ 4; Scarbrough Aff. ¶¶ 19-20, 44-46.  Cook denies either instance ever occurred and states she was unaware Scarbrough was in danger.  Cook Decl. ¶¶ 6-7, 10.  Scarbrough contends that on November 1, 2010, Cook informed Scarbrough that he was constantly filing grievances, getting everyone in trouble, that he was a liar, and that he could recall whatever conversation between the two of them he

---

[3] Scarbrough also contends that Clintsmen expressed his dislike of "blacks." Scarbrough Aff. ¶ 22.

wanted because she did not remember ever speaking with him.  Compl. ¶ 23; Scarbrough Aff. ¶ 49.

Scarbrough refused to provide either defendant Marshall or Nichols with his food tray during rounds, instead leaving his hand in the feed-up slot and refusing to comply with their direct orders to remove his hand and return the tray.  Isabella Decl. ¶¶ 21-22; Marshall Decl. (Dkt. No. 39-10) ¶¶ 7, 9-11; Nichols Decl. (Dkt. No. 39-12) ¶¶ 6-7, 9-11.  Scarbrough contends he informed Nichols and Marshall he was in fear for his life because he was being threatened with a weapon not to comply with their orders.  Compl. ¶¶ 25-26. Nichols and Marshall also contend that they had no way of knowing that Scarbrough was allegedly in danger.  Marshall Decl. ¶ 18; Nichols Decl. ¶ 18.  Scarbrough also contends that defendant social worker Evans arrived at his cell and asked him to remove his hand from the feed-up slot.  Evans Decl. (Dkt. No. 39-4) ¶ 5; Compl. ¶ 37; Scarbrough Aff. ¶ 55.  Scarbrough advised Evans of his feeling of fear, refusing to do Evans the "favor" of removing his arm from the slot, and Evans departed.  Compl. ¶ 37; Scarbrough Aff. ¶¶ 55-57.  Evans has no recollection of those events occurring.  Evans Decl. ¶ 6.

Marshall and Nichols then contacted defendant Isabella, the safety and security officer.  Isabella Decl. ¶ 22; Marshall Decl. ¶ 10; Nichols Decl. ¶ 10.  When Isabella arrived, he gave Scarbrough a direct order to remove his arm and leave his cell for a search.  Isabella Decl. ¶ 23.  Scarbrough complied, his cell was entered by staff without the use of force, searched, and his food tray was found and confiscated.  Isabella Decl. ¶ 24, 29; Marshall Decl. ¶¶ 12-13; Nichols Decl. ¶¶ 12-13.  Scarbrough was then, again, transferred to a different cell.  Isabella Decl. ¶ 25.  Scarbrough contends that a nurse arrived to examine him and he stated that he was in pain and the nurse did a cursory examination and deemed him in

acceptable health.  Compl. ¶ 25.

Two misbehavior reports were issued by Nichols and Marshall, describing the aforementioned events.  Isabella Decl. ¶¶ 26, 28; Marshall Decl. ¶ 8; Nichols Decl. ¶ 8; see also Dkt. No. 39-15 at 4 (misbehavior report issued by Marshall), 6 (misbehavior report issued by Nichols).  Scarbrough chose defendant Healy to act as his assistant, procuring various requested information to help Scarbrough mount his defense.  Healy Decl. (Dkt. No. 39-6) ¶ 8; Dkt. No. 39-7 at 2.  Healy made the requests for the witnesses, video tapes, and log book entries which Scarbrough sought.  Healy Decl. ¶¶ 10-11; Dkt. No. 39-7 at 5.  The only videos provided were of the time of the event, as Healy was informed that the administration decided to withhold the other videos.  Healy Decl. ¶¶ 12-13; Dkt. No. 39-7 at 5.

On November 5, 2010, defendant Haug issued a decision after presiding over a two-day disciplinary hearing which combined the two misbehavior reports Scarbrough received on the afternoon of October 12.  Haug Decl. (Dkt. No. 39-5) ¶¶ 5-6; Dkt. No. 39-15 at 23-48 (hearing transcript).  Scarbrough first acknowledged receipt of the misbehavior reports.  Dkt. No. 39-15 at 25-26.  Scarbrough again pled guilty to the charges, which Haug contends could have signified the end of the hearing.  Haug Decl. ¶ 8; Isabella Decl. ¶ 27; Dkt. No. 39-15 at 29-30, 37-39.  Scarbrough disputes this.  Scarbrough Aff. ¶¶ 29-30.  The hearing transcript states as follows:

> Haug:  Stop right there, let me do one thing first, alright.  How do you plead to the charge of 107.10 Interference with employee?
>
> Scarbrough:  I uh, uh, interference with an employee?  I was forced to . . .

Haug:        No, it's guilty or not guilty, that's how you plead, it's not I was forced to.

Scarbrough:    Okay, I wasn't in my right mind and I couldn't be in my right mind being held at any type of gun point, knife point.

Haug:        Okay, is it guilty or not guilty.

Scarbrough:    I (inaudible), is guess, I, I have to put my hand up.

Haug:        You pled guilty; alright that's how you're going to plead then okay.  How about 106.10 Refusing a direct order?

Scarbrough:    Yes, I'll plead guilty because I had to, I had to.

Haug:        109.12 Movement Regulation Violation?

Scarbrough:    Movement regulation violation?

Haug:        In other words you wouldn't move, you wouldn't do as your told, you wouldn't move from cell to cell or whatever.

Scarbrough:    Um, yeah, yeah, yeah I gotta plead guilty to all that because it happened.

Haug:        Alright, and refusing a direct order the second time you plead guilty to too then as you stated, and for holding your tray, Messhall Serving Violation 124.16?

Scarbrough:    I plead I was guilty to two, the same direct order?

Haug:        Yeah because Lt. Isabella told you and somebody else told you.

Scarbrough:    It was all the same . . .

Haug:        Let the record reflect he has plead guilty to all of the charges . . . Okay continue.

Scarbrough:    Alright, I give you an explanation.

Dkt. No. 39-15 at 28-32.  Haug allowed the hearing to continue and Scarbrough was

permitted to provide an explanation and call and question witnesses.  Haug Decl. ¶ 9.

Scarbrough testified that prior to his arrival at his new cell, the prior cell mate informed King that Scarbrough was a Cripts gang member and that he would not get along well living with members of the Bloods gang.  Dkt. No. 39-15 at 30.  Thereafter, Scarbrough was moved to the cell and threatened by inmate Murray.  Haug Decl. ¶ 12; Dkt. No. 39-15 at 27-28.  Due to these threats, Scarbrough was forced to maintain his arm in the feed-up slot perpetuating the incident.  Haug Decl. ¶ 13.  After the incident, Scarbrough was assigned to a different cell.  Haug Decl. ¶ 14.

Scarbrough also raised his concerns with the various video materials the administration failed to produce to him.  Healy Decl. ¶ 17; Dkt. No. 39-15 at 26.  Haug reaffirmed the administration's decision and decided the charges.  Healy Decl. ¶ 17.  There were no additional complaints about Healy's assistance at that time.  Healy Decl. ¶ 18; Dkt. No. 39-15 at 30-31 (discussing Healy's inability to procure the videos but stating that otherwise "he did a good job . . . .").

In finding Scarbrough guilty, Haug relied upon Scarbrough's own admissions, as well as a prior statement that he caused a disruption to get a new cell mate, which he accomplished by again being transferred from the cell.  Dkt. No. 39-15 at 47-48.  Haug sentenced Scarbrough to seven days on a restricted diet.  Haug Decl. ¶ 15.  Haug, as hearing officer, and Quinn, as a reviewing Lieutenant, were only permitted to recommend the sentence as it required approval by the medical department, security department, and superintendent.  Haug Decl. ¶¶ 16-17; Quinn Decl. ¶¶ 30-32; Dkt. No. 39-15 at 50, 58-59.  The diet was proposed in light of Scarbrough's extensive disciplinary history and pending disciplinary sentences, making a restricted diet the only available, effective disposition.

Haug Decl. ¶ 18; Quinn Decl. ¶¶ 33-34; Compl. ¶ 31.  The restricted diet was imposed for seven days.  Dkt. No. 39-15 at 59; Compl. ¶¶ 31-32; <u>but</u> <u>see</u> Scarbrough Aff. ¶¶ 52-53 (explaining that there was loaf given post pre- and post-hearing as a restriction).

Scarbrough alleges that his rights were violated when he was not permitted to call all of the witnesses he requested and was denied "the oppertunity [sic] for a fair diposition [sic], after explaining to him circumstantial and substantial evidence."  Compl. ¶ 38; Haug Decl. ¶ 10 (explaining that he "disallow three witnesses that seemed to [him] either redundant or not present when the events occurred.").  Cook was not called as a witness as she did not witness the events upon which the misbehavior report was based.  Cook Decl. ¶ 8.

## C. Grievances

Scarbrough also claims that he filed multiple grievances about the above complaints, as well as about at least one other altercation where he was attacked by another inmate. Compl. ¶ 30.  Scarbrough contends that he has received no response to these grievances. <u>Id.</u>  Scarbrough also contends that he wrote to Superintendent Rock about the occurrences on October 12, 2010.  <u>Id.</u> ¶ 36.

## II. Discussion

Scarbrough contends that his Eighth Amendment rights were violated when defendants failed to (1) heed the warnings about placing him in the cell with members from a rival gang and (2) provide him with sufficient medical treatment.  Liberally construing the complaint, Scarbrough also alleges a failure to protect claim against defendants when he was involved

11

with Murray.  Scarbrough also contends that his Due Process rights were violated when

Haug refused to allow Scarbrough to present additional witnesses, receive tapes which the

administration had denied, and failed to provide a fair disposition.  Defendants seek

judgment because (1) personal involvement has not been pled; (2) Scarbrough's claims are

meritless; (3) certain claims fail to state a claim upon which relief can be granted; (4)

defendants are entitled to qualified immunity; and (5) the Eleventh Amendment bars

recovery.


## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to

any material fact if supported by affidavits or other suitable evidence and the moving party

is entitled to judgment as a matter of law. The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial. The non-moving party must do more than merely show that there is some

doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact

could find in favor of the non-moving party for a court to grant a motion for summary

judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994);

Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must

afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d

471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185,

191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district

courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings

liberally.'" (citations omitted))..  However, the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact.

Anderson, 477 U.S. at 247-48.


## B. Personal Involvement

Defendants contend that Scarbrough has failed to establish that the named defendants

were personally involved in any of the alleged constitutional deprivations.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d

Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

supervisory officials may not be held liable merely because they held a position of authority.

Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may

be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[4]

Viewing the facts in the light most favorable to Scarbrough, defendants Clintsman, Cook, Evans, Marshall, Isabella, and Nicols were all alleged to have been witnesses to Scarbrough's altercation with Murray and heard Scarbrough say that he was in fear for his life.  Additionally, while defendant Mitchell contends otherwise, Scarbrough identified him as the individual who specifically denied him medical attention.  Moreover, defendants Health, Haug and Quinn allegedly violated Scarbrough's due process rights by denying him appropriate representation and a fair hearing and inappropriately sanctioning him to a restricted diet.  Lastly, defendants King, Warnock, and Rock all allegedly had knowledge that Scarbrough's transfers would house him with members of a rival gang, a gang with

---

[4]  Various courts in the Second Circuit have considered how, if at all, the decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), affected the five Colon factors which were traditionally used to determine personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monore County, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (holding that Iqbal did not eliminate Colon's personal involvement standard).

which he had disciplinary issues in the past, and that they ignored such information and placed Scarbrough in a compromising situation nonetheless.

Therefore, Scarbrough has offered sufficient evidence which, if believed, demonstrates the personal involvement of all defendants.  Thus, defendants motion on this ground should be denied.[5]

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970); Matthews v. Armitage, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

―――――――――――――――――

[5] The remainder of defendants' arguments located in the personal involvement section will be addressed independently as arguments regarding the merits of Scarbrough's claims.

### 1.  Failure to Protect

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer, 511 U.S. at 832.  Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id. at 834 (citing Helling v. McKinney, 509 U.S. 25, 31-32 (1993)); see also Matthews, 36 F. Supp. 2d at 124 (same).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). In order to state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison official must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Matthews, 36 F. Supp. 1 at 124-25 (citing Farmer, 511 U.S. at 834) (internal citations and quotation marks omitted).

Scarbrough contends that defendants failed to protect him when they knowingly housed him with cell mates that were members of a rival gang.  Such housing assignments led to a fight with closed-fist punches in the morning and Scarbrough refusing to remove his arm from the feed-up slot while allegedly being threatened with a razor in the afternoon. Scarbrough makes conclusory allegations that Murray, his afternoon cell mate, attacked him upon arrival into the cell and threatened him with a razor in front of Cook.  Moreover, Scarbrough proffers that he pleaded with Isabella, Marshall, Nichols, Cook, and Evans to

16

assist him as he was in fear for his life.  However, despite these contentions that

defendants placed him in extremely dangerous situations, Scarbrough fails to produce any

evidence of injury from these encounters.  "Without any evidence of injury, [Scarbrough's]

failure to protect claim[s] fail[]."  Roseboro v. Gillespie, 791 F. Supp. 2d 353, 382-83

(S.D.N.Y. 2011) (citing cases).  In fact, the affidavits of defendants unanimously detail how

both of Scarbrough's incidents resolved without the use of force.  Moreover, affidavits and

misbehavior reports detail that after the morning altercation with Smith, both inmates

reported no injuries.  There are, therefore, no issues of fact presented as to whether

Scarbrough suffered any actual injury.

Additionally, even if the objective prong of Scarbrough's claim was established, the

subjective prong would not.  "There was simply no record evidence that defendants were

aware that [Scarbrough] was at risk of attack by any member of the Bloods gang, or any

other inmate for that matter."  Paulino v. Burlington County Jail, 438 Fed. Appx. 106, 109

(3d Cir. 2011) (citations omitted).  Scarbrough contends that he was previously in protective

custody for a fight with a Bloods gang member in Auburn.  This information was insufficient

to establish that Scarbrough would be similarly at risk for attack from other inmates, even of

a similar gang affiliation, at a different facility.  Moreover, defendants stated that gang

affiliation was not recorded and was not used as a basis for cell selection.  There is nothing

in the record to indicate that Scarbrough shared with any defendants his prior gang

membership, or fear for his personal safety, including after his first altercation with Smith,

whereupon neither inmate would disclose the reason for the fight.  Thus, even if

Scarbrough would have been injured, there is no way to know that he was in continuing

danger since neither inmate shared the motivations for the altercation and there was no

independent indication that based on the events with Smith, Murray would subsequently retaliate against Scarbrough.  See Murray v. Goord, 668 F. Supp. 2d 344, 358 (N.D.N.Y. 2009) (dismissing case where plaintiff Murray was stabbed after a defendant corrections officer informed plaintiff that he had been threatened by the inmate who ultimately stabbed him because the isolated threat failed to show a substantial risk of serious harm).

Scarbrough contends that another inmate notified King of the potential for trouble if Scarbrough was housed with a Blood.  However, such conclusory allegations without anything further are insufficient to raise an issue of material fact.  This defect in Scarbrough's argument is further compounded by Scarbrough's inconsistent, conclusory statements that King, Rock, Isabella, Quinn, and Warnock told other inmates about his gang status, whereupon in other papers Scarbrough contends that defendants were informed of potential conflicts and trouble by inmates already at Upstate and housed on the cell block.  Given that it is unclear who told whom about Scarbrough's alleged former gang status, and that Scarbrough never personally shared this information with anyone or provided additional support for his conclusory claims that the aforementioned defendants knew he was a former Crip, disregarded it, and housed him with rival gang members regardless, such claims must be dismissed.

Accordingly, defendants' motion on this ground should be granted.


### 2.  Medical Care

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting

Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

In this case, Scarbrough contends that he was denied medical care.  However, these claims are inconsistent as to who provided the medical care as Scarbrough claims, in his various submissions, that this denial was done by an unidentified nurse, Mitchell, and unnamed Sgt. Rackoe.  Regardless of the true identity of the individual who allegedly denied Scarbrough his constitutional rights, Scarbrough's claim fails because he has not

established the first prong of the Eighth Amendment analysis.

Scarbrough claims that he had pain in his back and head.  Conclusory allegations are insufficient to support an Eighth Amendment claim.  Streeter v. Goord, 519 F. Supp. 2d 289, 303 (N.D.N.Y. 2007) (concluding that where plaintiff fails to offer evidence to support conclusory allegations, such allegations are insufficient to defeat a supported motion for summary judgment).  Multiple defendants indicated that Scarbrough failed to indicate he had injuries from either altercation on October 12.  Moreover, Scarbrough fails to describe the severity or persistence of this pain.  In Scarbrough's own affidavit, he indicated that the pain in his head and back were pre-existing and identical in nature to what he was previously experiencing.

Pain, alone, is insufficient to satisfy the objective prong.  The pain must be more than de minimis.  Perry v. Stephens, 659 F. Supp. 2d 577, 582-83 (S.D.N.Y. 2009) ("[C]ourts in this Circuit have routinely found [minor bruising and pain which dissipates after four days to be] . . . minimal injuries and pain insufficient to satisfy the objective prong . . . .") (citing cases).  This is not the present case.  Scarbrough makes, at best, a few fleeting references to non-specific, unquantified levels of pain in his head and neck.  This is further mitigated by recorded statements from Scarbrough and others that no injuries occurred.

Accordingly, defendants motion on this ground should be granted.

**D. Due Process**[6]

**1. Atypical and Significant Deprivation**

Scarbrough alleged multiple deficiencies in his disciplinary process including the inability to present appropriate witnesses and video evidence, inadequate assistance from defendant Healy, Haug's inappropriate reliance on a plea that Scarbrough contends was not actually asserting his guilt, and Haug's unconstitutional determination which was not based on sufficient evidence.  As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation.  The Second Circuit

---

[6] While not argued by defendants, Scarbrough's due process claims appear to run afoul of the "favorable termination" rule of Heck v. Humphrey, 512 U.S. 477, 487-87 (1994).  That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983.  This rule applies to challenges to procedures used in prison disciplinary proceedings. Edwards. v. Balisok, 520 U.S. 641 (1997).  There is no evidence that Scarbrough's disciplinary convictions were ever vacated, overturned, or expunged.  Thus, the Heck rule still applies and any procedural challenges are barred.  Therefore, because Scarbrough's recovery of damages here for faulty hearing procedures and improper reliance of a plea and his requested relief would necessarily imply the invalidity of his disciplinary convictions, the requested relief based on that hearing is barred.

21

has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998).  The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under Sandin.  Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000).

As Scarbrough was sanctioned with a reprimand and counsel for his first disciplinary proceeding and a restricted diet for his second proceeding, it is clear that he spent no time in segregated housing for these violations.  Thus, this may not be used as a basis to establish an atypical and significant hardship.  Instead, Scarbrough contends that his restricted diet was atypical and significant.

> As applied to a due process claim involving a prisoner's diet, in order to allege an atypical and significant hardship, it is not sufficient merely to allege a dietary restriction, but rather a plaintiff must allege that the restricted diet is nutritionally inadequate or otherwise poses a threat to his physical well-being.

Porter v. Wolczyk, No. 04-CV-708, 2007 WL 397046, at *3 (N.D.N.Y. Jan. 30, 2007) (citing cases) (attached hereto).  While the amount of time Scarbrough was placed on the diet is at issue, whether it be seven or fourteen days, the outcome is the same.  In this case, Scarbrough proffers no claims of nutritional inadequacy or threats or consequences to his health and physical well-being.  Moreover, any such claims are belied by the fact that medical personnel also approved of the restricted diet.  Thus, Scarbrough has failed to establish that he suffered from an atypical and significant hardship as the result of his disciplinary sanctions.

Accordingly, defendants' motion on this ground should be granted.[7]

## 2. Fair and Impartial Hearing

While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  A prisoner is "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken."  Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).  Scarbrough contends that (1) Haug was an impartial hearing officer because his decision was not based on sufficient evidence and he precluded Scarbrough from interviewing additional witnesses and (2) Healy provided ineffective assistance in presenting his defense.

### a.  Haug

Prisoners have a constitutional right to a fair and impartial hearing officer.  See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).  However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . .  [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts."  Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir.

---

[7]Given this recommendation, it is unnecessary to reach the merits of Scarbrough's due process claim.  However, it is noted that Scarbrough has failed to offer facts sufficient to demonstrate the merits of this claim.

1996) (citations omitted).   The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . " and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt."   Luna v. Pico, 356 F.3d 481, 487-88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

In this case, it is clear that Scarbrough's disciplinary conviction was based on ample evidence and that, even viewing the evidence in the light most favorable to him, Haug was not biased.   There is little dispute over the factual underpinning of the misbehavior report and guilty plea.   The misbehavior report is consistent with the defendants recitation of the events as well as Scarbrough's recollection of the incident.   As the transcript from the disciplinary hearing illustrates, Scarbrough admitted to disobeying direct orders to return his tray and remove his hand from the feed-up slot.   Scarbrough participated in those actions, though he had an explanation for why he did so.   Haug acknowledged both the guilty plea and explanation, affording Scarbrough an opportunity to present an explanation.   Ultimately, Haug determined that Scarbrough required punishment for his blatant disregard of multiple orders issued to him by his superiors.

Additionally, Scarbrough's complaint alleges that he was precluded from calling additional witnesses during his hearing, including Cook.   However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity."   Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992) (internal quotations and citations omitted); see also Richardson, 833 F. Supp. at 152. It is undisputed that Cook did not witness the events which gave rise to the misbehavior reports.   Her attendance at Scarbrough's cell was earlier in the day and she left prior to

these events occurring.  Thus, her testimony would have been irrelevant because she had

no personal knowledge of the events being decided at the disciplinary proceeding.

The same holds true for copies of the videos which were withheld by the administration

and affirmed by Haug.  "Courts have long recognized . . . that the right to know evidence

supporting prison disciplinary rulings is not absolute."  Sira, 380 F.3d at 74 (citations

omitted).  Because correctional facilities present "risks of violence or intimidation directed at

other inmates or staff . . . [a hearing officer may decline] disclosure of evidence [in light of]

such risks . . . ."  Id. at 75 (internal quotation marks and citation omitted).  Generally, the

judgment of a prison officer in this context will not be questioned as long as there was

"freedom from arbitrary governmental action."  Id. (citations omitted).  Accordingly, when

such procedural rights are denied, "prison officials . . . must offer a reasonable justification

for their actions . . . ."  Id. (citations omitted).  The tape which was provided was that of the

incident.  Any tapes showing other parts of the facility or day were irrelevant when

determining the validity of the misbehavior report and the appropriate disciplinary sanction.

Therefore, defendants' motion on this ground should be granted.


### b.  Healy

"Prison authorities have a constitutional obligation to provide assistance to an inmate in

marshaling evidence and presenting a defense when he is faced with disciplinary charges."

Eng v. Coughlin, 858 F.2d 889, 897 (2d Cir. 1988).  Such assistance is intended to aid

inmates to "gather[] evidence, obtain[] documents and relevant tapes, and interview[]

witnesses.  At a minimum, an assistant should perform the investigatory tasks which the

inmate, were he able, could perform for himself."  Id. at 898.  The Second Circuit has also

25

held "that for inmates disabled by confinement in [separate housing] . . . , the right to substantive assistance is an obligation . . . [to] be provided in good faith and the best interests of the inmate." Id.  Any violations of this right to assistance are reviewed to assess "whether the error was harmless or prejudicial." Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991).

In this case, Scarbrough chose Healy as his assistant.  Moreover, Healy requested all of the videos and witnesses which Scarbrough wanted.  However, for the reasons discussed above, some of those requests were denied.  Those denials were not a product of any failure in  Healy's representation, but instead due to the necessities of the disciplinary hearing.  Accordingly, these actions indicate that Healy provided appropriate assistance.  Moreover, Scarbrough also stated during his hearing that Healy did well assisting him, belying his claims that Healy's actions were inadequate.

Accordingly, defendants' motion on this ground should be granted.


## E. Grievance Proceedings

An action commenced pursuant to § 1983 requires proof of the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal government.  42 U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981).  "[I]nmate grievance programs[8] created by state

---

[8]The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] .

law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." Shell v. Brzezniak, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) (citations omitted); see also Dolberry v. Levine, 567 F. Supp. 2d 413, 416 (W.D.N.Y. 2008) ("The law is clear that plaintiff has no constitutional right to have his grievances processed at all, or if processed, to have the procedure done properly.  A violation of the inmate grievance procedures does not give rise to a claim under section 1983.") (internal quotation marks and citations omitted).  However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." Shell, 365 F. Supp. 2d at 370 (citations omitted).

Liberally construing Scarbrough's complaint, he alleges that he has filed multiple grievances that have gone unanswered.  However, even construing the facts in the light most favorable to Scarbrough, he cannot establish that he had a liberty interest which required constitutional protection.  To the extent that Scarbrough has proffered complaints about the grievance process as a whole, stating that grievances were filed and never acted upon, such claims are not cognizable in this Court.  Additionally, to the extent Scarbrough's grievances dealt with the underlying constitutional violations discussed herein, such as alleged violations of his Eighth and Fourteenth Amendment rights, for the reasons proffered herein, such claims are meritless.

Accordingly, defendants' motion as to Scarbrough's claims concerning the grievance process and proceedings should be granted.

. . within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

**F. Eleventh Amendment**

Scarbrough sues the defendants in both their individual and official capacities.  Compl. Defendants seek summary judgment on Scarbrough's claims against defendants in their official capacities.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988)(citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Here, Scarbrough seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCS.  Thus, the Eleventh Amendment bar applies and serves to prohibit Scarbrough's claim for monetary damages against defendants in their official capacities.

Accordingly, it is recommended that defendants' motion on this ground be granted.


### G. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal government.  42 U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981).  Scarbrough's claims that he heard Clintsman once say that he did not like black people is insufficient to state a constitutional violation.  This is because verbal threats and harassment, alone, are insufficient to state a constitutional claim.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under . . . § 1983.").

Accordingly, defendants' motion should be granted as to all such claims.

29

**H. Qualified Immunity**

Finally, defendants claim that even if Scarbrough's constitutional claims are substantiated, defendants are nevertheless entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached concerning any of Scarbrough's claims because, for the reasons discussed above, Scarbrough has failed to raise a question of fact as to the first prong of the inquiry.

Accordingly, in the alternative, defendants' motion on this ground should be granted.

30

**III. Motion to Compel**

Scarbrough moved pursuant to Fed. R. Civ. P. 37 to compel defendants to provide answers to certain interrogatories and produce certain documents.  Dkt. No. 35.  That motion was served before defendants filed their motion for summary judgment.  Dkt. No. 39.

At the outset of the case, this Court filed a "Mandatory Pretrial Discovery and Scheduling Order in Civil Rights Actions Brought by Inmates Pro Se." a standardized order filed in this district in all such cases.  Dkt. No. 26.  It requires both the plaintiff and the defendants to serve an opposing party with certain discovery materials without the necessity of a discovery request.  Id.  Its stated purpose is "[t]o expedite the fair disposition of this action and to discourage wasteful pretrial activities . . . ."  Id. at 1.  The order requires defendants' counsel to file a notice or copy of a cover letter certifying that defendants have complied with the order.  Id. at 3-4 & n.3.  Defendants here filed that certification.  Dkt. No. 29; see also Dkt. No. 37 (responding letter from defendants stating they provided Scarbrough with 246 pages of discovery including medical records, misbehavior reports, 140 pages of grievances, transcripts, and interrogatory responses).  The order does not preclude a plaintiff or defendant from seeking additional discovery from an opposing party, but, given the order and its purpose, such additional discovery must not be cumulative, overbroad, or unduly burdensome, and must satisfy the requirements of relevance under Fed. R. Civ. P. 26.

Defendants now having filed a motion for summary judgment after complying with the order, and this Court now having found that the motion should be granted as to all claims and all defendants, the threshold issue on Scarbrough's motion to compel is whether the

additional interrogatory responses and documents sought could reasonably alter the outcome of defendants' motion. Reviewing the interrogatories and document demands in the light most favorable to Scarbrough, they would not. Both seek additional information as to the individuals involved and which individuals performed which acts.

As to both inquiries, the information sought is irrelevant. Scarbrough's claims and proof were evaluated here in the light most favorable to Scarbrough, including drawing all inferences which the evidence would support in his favor. Even under this highly favorable standard of review, Scarbrough has been unable to establish the violations alleged in the amended complaint because, as alleged, they fail to rise to the level of cognizable deprivations. Additional information will have no impact on this conclusion where the undisputed events alleged by Scarbrough fail to constitute sufficient claims.

Accordingly, Scarbrough's motion to compel is denied.


### IV. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that Scarbrough's motion to compel (Dkt. No. 35) be **DENIED**; and

**IT IS RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED** as to all defendants and all claims**.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

REVIEW.  <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892

F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  June 22, 2012
        Albany, New York

_____
United States Magistrate Judge